IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MONTWAY LLC d/b/a MONTWAY
AUTO TRANSPORT and MDG EOOD
d/b/a MONTWAY BULGARIA,

        *Plaintiffs,*

        v.

NAVI TRANSPORT SERVICES LLC
d/b/a NAVI AUTO TRANSPORT, IVAN
KARAKOSTOV, and RADION
TZAKOV,

        *Defendants.*

No. 25-cv-00381-SB

---

James L. Higgins and Gianna Carina Penezic, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, Delaware; Sanjay K. Murthy, Dorien J. Clark, and Rocco J. Screnci, MCANDREWS, HELD & MALLOY, LTD., Chicago, Illinois.

        *Counsel for Plaintiffs.*

Emily L. Skaug and Ronald P. Golden III, BAYARD, P.A., Wilmington, Delaware; John R. Fornaciari and Kevin N. Dorn, BAKER & HOSTETLER LLP, Washington, D.C.

        *Counsel for Defendants.*

---

### MEMORANDUM OPINION

November 11, 2025

BIBAS, *Circuit Judge*, sitting by designation.

The United States spans six time zones and nearly four million square miles. When people move from one part of the country to another, they often choose to ship their cars rather than drive themselves. A handful of shipping companies compete for that business, including Montway. For two decades, it has invested millions in marketing.

But a few years ago, two of its former employees founded a competitor, Navi. With limited funds and no marketing budget, Navi allegedly resorted to poaching Montway's potential customers. So Montway and its subsidiary sued Navi and its two founders for misappropriation of trade secrets and Navi for false advertising. Navi and its founders moved to dismiss. I partly deny and partly grant the motion.

## I. KARAKOSTOV & TZAKOV LEAVE MONTWAY TO COMPETE WITH IT

Shipping a vehicle is resource intensive, requiring several players to get the job done. Brokers work with potential customers. A customer who wants to ship his car reaches out to a broker with his location, destination, and vehicle information. Compl., D.I. 1 ¶ 21. The broker responds with a quote and posts the shipping job to a centralized "load board" viewable by other brokers and carriers—the entities who would physically transport a vehicle. *Id.* If a carrier thinks that the offered price is fair, it may accept the job. *Id.* The broker then connects the carrier and the customer and takes a cut of the quoted price as a broker's fee. *Id.* To maintain the competitiveness of the brokerage system, brokers do not include a customer's identity or contact information when they post jobs to the load board; including that information would let other brokers to reach out to would-be customers and undercut the original broker on price. *Id.* ¶ 29.

Montway is one of the "nation's leading" automotive shipping brokers. *Id.* ¶¶ 1, 21. Since it was formed in the early 2000s, Montway has shipped more than a million vehicles. *Id.* ¶¶ 1, 23. To generate customer leads, it invests "several hundreds of thousands of dollars each month on marketing." *Id.* ¶ 26. As a result, almost 140,000 potential customers visit Montway's website every month. *Id.* ¶ 27. Many of them

later ask for quotes, which Montway provides "in real-time." *Id.* ¶ 28. Montway does not post a job to the load board until a customer has accepted its quote. *Id.* ¶ 28. Consistent with industry practice, Montway's postings to the load board do not include the customer's name or contact information. *Id.* ¶ 29. Montway trains its employees not to share that information without permission, and company policy bars unauthorized disclosure. *Id.* ¶ 55.

Montway is organized in Delaware and headquartered in Illinois, but it runs a fully owned subsidiary, MDG EOOD, out of Bulgaria. *Id.* ¶¶ 8–9. MDG EOOD is a "servicing entity" that employs and runs Montway's sales department. *Id.* ¶ 30. Ivan "Jerry" Karakostov worked in the sales department for 6½ years. *Id.* But he grew restless. So in 2023, while still employed by MDG EOOD, Karakostov formed a competing business. *Id.* ¶ 31. Soon after, Karakostov quit and set up a new entity for the competing business: Navi Transport Services LLC. *Id.* Navi quickly approached one of Karakostov's former coworkers at Montway, Radion "Ruben" Tzakov, and asked him to join the venture. *Id.* ¶ 5. Tzakov had worked as a Montway account manager for almost three years. *Id.* ¶ 30. But he was interested in what Navi had to offer, so he teamed up with Karakostov.

While he was still at MDG EOOD, Tzakov (along with Karakostov) approached Montway's Bulgarian law firm, seeking assistance "restructur[ing] corporate entities associated with" Navi. *Id.* ¶ 34. Both men denied any past or present association with Montway or its associated companies, but the law firm conducted a conflicts check and discovered that Tzakov was still an MDG EOOD employee and Karakostov was a

3

former one. *Id.* After the law firm told the men it could not represent them or their company, Tzakov notified MDG EOOD of his intent to resign from his position. *Id.* ¶ 32. When Tzakov's supervisor asked him why he was leaving, Tzakov did not disclose that he had a new position at Navi and instead said he was taking time to "reset" for "personal reasons." *Id.* ¶¶ 32–34.

Soon, strange things started happening to Montway's sales pipeline. When Montway got a customer inquiry, it would send the potential customer a quote and record the inquiry in its internal system as it always did. *Id.* ¶ 41. But before the customer accepted the quote (and thus, before Montway posted the job to the load board), Navi would post the identical job to the load board at a lower price. The customer would then decline Montway's quote. *See generally id.* ¶¶ 42–49 (collecting examples).

Montway identified two potential explanations for this phenomenon. On the one hand, Montway's potential customers might be submitting quote requests to Navi as well, with Navi choosing to post potential jobs to the load board before potential customers accepted its quotes. That was unlikely, Montway thought, because Navi had next to no internet presence and only a handful of website visitors per month. *Id.* ¶¶ 37, 39. On the other hand, Karakostov and Tzakov might be colluding with current Montway employees to get Montway's leads, as well as the contact information for its potential customers. With that information in hand, Navi could send a would-be Montway customer an unsolicited quote that beat Montway on price. *Id.* ¶ 41.

Suspicious, Montway took a closer look at Navi's website. The website generally resembled Montway's own, including a Terms of Use page that "chose to apply Illinois

law" (like Montway's) even though Navi was headquartered in Delaware. *Id.* ¶ 62. The website also contained a handful of peculiar, similarly worded reviews, including multiple reviews by people with the same name. *Id.* ¶¶ 63–65. And the website claimed that Navi had shipped more than 20,000 vehicles, even though the entity had only been in business for a few months and had a negligible online footprint. *Id.* ¶ 68. Montway poked around further and found at least one positive internet review of Navi that had been posted by an ex-Montway employee who had never used Navi's services. *Id.* ¶ 66.

Montway and MDG EOOD promptly sued Navi, Karakostov, and Tzakov. They alleged that all three defendants had violated the federal Defend Trade Secrets Act (DTSA) and the Delaware Uniform Trade Secrets Act (DUTSA), and that Navi had violated the federal Lanham Act's ban on false advertising. *Id.* ¶¶ 69–104. Navi, Karakostov, and Tzakov moved to dismiss for failure to state a claim. D.I. 17; Fed. R. Civ. P. 12(b)(6). They also moved to dismiss MDG EOOD as a plaintiff for lack of standing. D.I. 17; Fed. R. Civ. P. 12(b)(1). In reviewing the motion, I must "accept as true all well-pled allegations and construe the complaint in the light most favorable to the plaintiffs." *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 253 (3d Cir. 2009).

## II.  MONTWAY STATES A DTSA CLAIM AGAINST NAVI FOR MISAPPROPRIATING TRADE SECRETS IN ITS CUSTOMER INFORMATION

Montway claims that Navi misappropriated various trade secrets by using its confidential information to steal potential customers. Compl. ¶¶ 69–81. "To make out a claim under the federal [DTSA], [Montway] must allege (1) a trade secret (2) connected to interstate commerce (3) that defendants misappropriated." *JPMorgan Chase Bank, Nat'l Ass'n v. Argus Info. & Advisory Servs. Inc.*, 765 F. Supp. 3d 367, 374

(D. Del. 2025) (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021)). Montway has satisfied the latter two elements, but only partially satisfied the first. So I let its DTSA claim against Navi proceed, but only as far as Montway asserts trade secrets in its potential customers' identities and contact information.

### A. The complaint alleges trade secrets in Montway's leads and potential-customer contact information, but not its quotes

"[I]nformation is a trade secret if (1) its owner 'has taken reasonable measures to keep [it] secret' and (2) its economic value comes partly from the fact that competitors do not know it." *JPMorgan*, 765 F. Supp. 3d at 375 (quoting 18 U.S.C. § 1839(3)). Montway's complaint satisfies both elements of the trade-secrets definition insofar as it asserts trade secrets in its customer leads, but not the quotes that it gives to potential customers.

*1. Montway keeps leads and contact information, but not quotes, secret.* Montway claims that it has taken various measures to keep its "leads, customer contact information, and quotes" secret, including by "train[ing] its employees about the confidential nature" of that information, "maintain[ing] internal policies and procedures that instruct employees on appropriately using and safeguarding" it, and "impos[ing] electronic safeguards to protect and limit access" to it. Compl. ¶ 55.

Those actions suffice for Montway to assert trade-secret protection in the leads and contact information. *See, e.g., Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, 2023 WL 5334638, at *20 (N.D. Ill. Aug. 18, 2023) (finding reasonable-measures element satisfied where plaintiff required its financial advisors to sign confidentiality agreements, limited network access, and "required employees and independent contractors to take compliance courses and undergo training about handling

confidential information"); *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 2021 WL 6275214, at *8 (D. Mass. Aug. 23, 2021) (similar); *cf. MAI Sys. Corp. v. Peak Comp., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (concluding, in the context of the similarly worded Uniform Trade Secrets Act, that making employees sign confidentiality agreements respecting trade secrets was a "reasonable step[] to insure … secrecy").

But Montway may not assert trade-secret protection over its quotes. As Montway itself acknowledges, once a customer accepts Montway's quote, it posts the job, sans customer identification, to the load board—visible to all Montway's competitors. Compl. ¶ 29. So Montway does not take reasonable measures, or any measures at all, to keep its quotes secret. To the contrary, its very business model requires publishing its quotes. In its opposition to Defendants' motion to dismiss, Montway admits that it "nowhere alleges that its customer quotes are, in isolation, trade secrets." D.I. 20 at 6.

*2. The value of Montway's leads and potential-customer contact information comes from their secrecy.* Montway alleges that "the identity and knowledge of customer leads derive[s] significant value to automotive transport brokerages from not being generally known or readily ascertainable." Compl. ¶ 56. According to the complaint, brokers like Montway and Navi are middlemen. When a potential customer reaches out, they provide the customer a quote and then post an *anonymized* version of the quote to the load board. *Id.* ¶ 29. If the price is right, a transport company will accept the job and the broker will take a cut. *Id.* ¶ 25. Were the quote not anonymized on the load board, a competing broker could reach out to the customer and undercut

the quoted price. *Id.* ¶ 29. So the secrecy of a potential customer's identity and contact information creates economic value for an individual broker.

Courts routinely accord trade-secrets protection to information about people who have expressed interest in a company's services. As the Northern District of Illinois has explained, "It is one thing to track down any 'John Smith.' But it is another to know that John Smith is ready, willing, and able to purchase" a product. *Allstate*, 2023 WL 5334638, at *19. So information regarding "customers' identities *as customers*" is protectable. *Id.*

In *ClearOne Advantage, LLC v. Kersen*, for example, a financial services company expended time and effort to develop "confidential and proprietary lists of 'leads'" who might benefit from its services. 756 F. Supp. 3d 30, 37 (D. Md. 2024). The lead lists were not "mass mailing lists"; rather, they comprised "people who ha[d] already expressed interest in [the company's] services and provided certain confidential financial information to the company." *Id.* at 42. The court found that the lists "could be extremely valuable in the hands of a competitor" and were likely protectible trade secrets under the DTSA as a result. *Id.*

Similarly, in *G&L Plumbing, Inc. v. Kibbe*, a plumbing company maintained an internal database of "customer and potential customer contact information." 699 F. Supp. 3d 96, 106 (D. Mass. 2023). One of its employees "surreptitiously transferred key pieces" of that information to his "personal devices" and used it to solicit business for his "newly formed competing venture." *Id.* at 101. The court found that the contact information was "unquestionably valuable—especially in a highly competitive

8

market"—such that the company was likely to succeed on its DTSA claim. *Id.* at 106. Other courts have reached similar results. *See, e.g.*, *SolarCity Corp. v. Doria*, 2021 WL 5822608, at *3 (S.D. Cal. Dec. 8, 2021) (finding that "customer and potential customer information, including phone numbers, emails[,] and addresses" were "trade secrets" under the DTSA); *REVZIP, LLC v. McDonnell*, 2023 WL 3260662, at *23 (W.D. Pa. May 4, 2023) (same); *Canoo Techs., Inc. v. Harbinger Motors, Inc.*, 2024 WL 4329059, at *3 (C.D. Cal. Feb. 1, 2024) (same). So the identities and contact information of Montway's potential customers are trade secrets.

*3. Defendants are not persuasive in arguing that leads are not trade secrets.* Defendants protest that to be a protectible trade secret, customer information needs to be compiled in some kind of list. D.I. 21 at 6–7. But the relevant inquiry is not whether the plaintiff has made a list, but whether the information is readily available to competitors. So if a company makes a customer list that consists solely of information that is public (or even widely known in the industry), it does not qualify for trade-secret protection. *See Digital Ally, Inc. v. Util. Assocs., Inc.,* 2017 WL 1197561, at *25 (D. Kan. Mar. 30, 2017), *aff'd*, 882 F.3d 974 (10th Cir. 2018) ("Where a customer list is not kept confidential or is easily compiled by a third party, such list is not considered a trade secret."); *Arthur J. Gallagher & Co. v. Petree*, 2022 WL 1241232, at *6 (E.D. Cal. Apr. 27, 2022) ("[C]lient lists are not protected trade secrets where the names and addresses of persons, firms[,] and corporations using the type of products sold by plaintiff are commonly known to the trade.") (internal quotation marks omitted).

9

Yet if a company spends time and money soliciting business from individual customers whose identities are not known to competitors, information about those customers qualifies for trade-secret protection—even if it is not in a list. *See, e.g.*, *Express Scripts, Inc. v. Lavin*, 2017 WL 2903205, at *6 (E.D. Mo. July 7, 2017) (finding that the "identity of customers and potential customers" was a protectable trade secret because the plaintiff "gain[ed] a benefit from having [that information] remain unknown outside" the company); *Int'l Motor Contest Ass'n, Inc. v. Brzezinski Racing Prods.*, 2019 WL 13216584, at *5 (N.D. Iowa Sept. 16, 2019) (noting that "the identities of customers or prospective customers can be trade secrets" if "[t]he disclosure of that information could be harmful" to the plaintiff's interests).

Defendants also argue that the identities and contact information of Montway's potential customers are not protectable because the customers know that information themselves, and often share it with multiple brokers to secure the cheapest quote possible. D.I. 18 at 15. Not so. At the outset, it does not matter that a potential customer knows his own identity and contact information. If it did, customer information would never be a protectible trade secret—a conclusion belied by case law.

Instead, what matters is whether the information is readily available to *competing brokers*. And on that point, Montway and Defendants disagree. Montway says that prospective customers seek it out because of its online presence and good reputation, request quotes from it alone, and later get an unsolicited lower bid from Navi. Compl. ¶ 41. Defendants respond that customers routinely submit quote requests to multiple brokers. D.I. 18 at 14–15. To be sure, a widespread industry practice of would-be

customers requesting quotes from many competing brokers could potentially undermine any trade-secret interest Montway possesses in those customers' identities and contact information. *Cf. Cambridge Filter Corp. v. Int'l Filter Co.*, 548 F. Supp. 1301, 1306 (D. Nev. 1982) ("Where the plaintiff's customers are known to competitors as potential customers, the plaintiff's customer list is not a trade secret."). But the existence and extent of such a practice are fact disputes that I may not resolve on a motion to dismiss. Taking the facts in the complaint as true, as I must for now, information about Montway's potential customers is not readily available to its competitors.

### B. The complaint connects Montway's trade secrets to interstate commerce

Montway says that its leads "are used and intended for use in interstate shipping of motor vehicles." Compl. ¶ 71. Among other things, the complaint explains that Montway lost at least four interstate-shipping jobs to Navi. *Id.* ¶¶ 42–49. It also notes that Montway has "brokered the shipment of over a million vehicles." *Id.* ¶ 23. Those allegations satisfy the DTSA's interstate-commerce requirement. *See JPMorgan*, 765 F. Supp. 3d at 375 (finding interstate-commerce element satisfied where bank "gathered … data from credit cards swiped across the country" and "use[d] this information to make money from coast to coast").

### C. The complaint alleges that Navi misappropriated Montway's trade secrets

As relevant here, a defendant misappropriates if it (1) uses the plaintiff's trade secret (2) without express or implied consent and (3) the trade secret is derived from or through a person who owed a duty to the plaintiff to maintain its secrecy or limit its use. *See* 18 U.S.C. § 1839(5)(B).

11

The allegations in the complaint satisfy all those elements. Montway asserts that Navi gets the identities and contact information of prospective Montway customers through current Montway employees, sends an unsolicited lower bid to a prospective customer, and causes him to decline Montway's bid and contract with Navi instead. *See, e.g.*, Compl. ¶¶ 40–41. The complaint underscores that Montway does not consent to that use. *Id.* ¶ 58. And it emphasizes that all current Montway employees have a duty to protect the confidentiality of potential customer leads and contract information—a duty set forth in "internal policies and procedures" and employee training programs. *Id.* ¶¶ 55, 58. So Montway adequately alleges misappropriation.

Defendants object that all Montway's misappropriation allegations are circumstantial and insufficiently specific. But they demand more than is required at the motion-to-dismiss stage. According to Defendants, there is an entirely innocuous explanation for Navi's chronically undercutting Montway on price and poaching its customers: Montway's prospective customers submit quote requests to Navi, too, and ultimately choose the broker that offers the best deal. D.I. 18 at 17. Said another way, Defendants argue that Navi has come by its customers honestly—the same way Montway does. Since Montway's contrary theory relies solely on circumstantial evidence, Defendants say, "more facts must be pleaded to plausibly allege … misappropriation." D.I. 21 at 9.

Defendants are correct that where "circumstantial evidence may leave ambiguous the lawfulness of the competitor's conduct," some "plus factor" is generally necessary to adequately plead misappropriation. *Oakwood*, 999 F.3d at 912 n.19. In *Oakwood*,

12

for example, the Third Circuit declined to dismiss a DTSA claim premised on circumstantial evidence because the plaintiff did "not rely on [competitor's] access to trade secrets alone." *Id.* at 912. Instead, the plaintiff "indicat[ed] the plausibility of trade secret misappropriation by: (1) the timing of employment, (2) the former employee's concealment of the new work he would be doing with the defendant, (3) the former employee's lack of relevant expertise, (4) his prior access to plaintiff's trade secrets, and (5) defendant's rapid success in developing technology that took plaintiff … years to develop." *Beta Pharma, Inc. v. InventisBio (Shanghai) Co.*, 2022 WL 17547265, at *3 (D.N.J. Dec. 8, 2022) (glossing *Oakwood*, 999 F.3d at 911).

But contrary to Defendants' arguments, Montway's complaint alleges plenty of "plus factor[s]" that make its theory of misappropriation sufficiently plausible to survive dismissal. For starters, Montway asserts that Navi's website "receives fewer than 125 visitors to its website per month—750-times less than Montway." Compl. 17 ¶ 37. That lack of website traffic makes Navi's theory—that Montway's would-be customers submit quote requests to Navi, too—highly implausible. More likely, Navi submits unsolicited bids to Montway's prospective customers—which it could do only if it had somehow obtained their identities and contact information ahead of time.

Relatedly, Montway claims that it "appear[s] on the first page of search results and [is] listed on multiple third-party car shipping company lists," whereas "the only way to find Navi online is to specifically search … for 'Navi Transport' or 'Navi Auto.'" Compl. ¶ 39. Navi's negligible internet presence further bolsters Montway's theory that Navi reaches out to prospective customers and not the other way around.

13

Finally, Montway offers a screenshot of a negative internet review by a Navi customer, who claims that Navi "*solicited* [the reviewer's] business to transport [his] car from MD to FL." Compl. ¶ 52 (emphasis added); *see also id.* ¶ 50 ("Navi … uses the illegally obtained trade secret prospective customer contact information to contact Montway's prospective customer and offer Navi's services … at a lower price, without the customer ever having contacted Navi for services or a quote (and most likely without ever having heard of Navi prior to Navi's solicitation)."). That review lends further support to Montway's theory that Navi sends out unsolicited quotes as opposed to simply contacting prospective customers who request them.

To be sure, Montway still needs to *prove* its theory that deceitful Montway employees are in cahoots with Navi. It is possible that Navi has not misappropriated anything and that it has discovered the identities and contact information of potential customers through quote requests that they submit on Navi's website. But that is a question for summary judgment and, potentially, for trial. At this stage, all Montway needed to do was assert facts giving rise to the plausible inference that Defendants misappropriated its trade secrets. It has cleared that bar. So I let Montway's DTSA claim to proceed against Navi as far as it asserts trade secrets in the identities and contact information of potential customers who submit quote requests on Montway's website.

### III.   I DISMISS MONTWAY'S DUTSA CLAIM AGAINST NAVI

In addition to its DTSA count, Montway asserts a parallel count under the Delaware Uniform Trade Secrets Act. "The DTSA and DUTSA are substantively identical." *I-Mab Biopharma v. Inhibrx, Inc.*, 2024 WL 5335719, at *2 n.5 (D. Del. Nov. 6, 2024). So as a general matter, the viability of a DUTSA claim rises and falls

with a DTSA claim. But the DUTSA requires something that the DTSA does not: that "the misappropriation happened" in Delaware. *JPMorgan*, 765 F. Supp. 3d at 380 (emphasis removed). If the misappropriation happened in another state or country, the DUTSA does not apply. *See id.*

Figuring out where misappropriation has occurred is fact-specific. The plaintiff's state of incorporation (or registration in the case of a non-incorporated entity) is not dispositive, maybe not even relevant. *Focus Fin. Partners, LLC v. Holsopple*, 250 A.3d 939, 970 (Del. Ch. 2020). The plaintiff's principal place of business may be relevant, since the effects of the misappropriation are probably felt most acutely there. *See id.*; *see also AlixPartners, LLP v. Mori*, 2022 WL 1111404, at *18 (Del. Ch. Apr. 14, 2022). But even "the place of [the plaintiff's] injury is less significant in the case of … the misappropriation of trade values." *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 267 (3d Cir. 2000) (quoting Restatement (Second) of Conflicts § 145 cmt. f (1971)). Instead, the place where "the vast majority of the conduct … relevant to" the misappropriation occurred guides the analysis. *Id.*; *see also Focus*, 250 A.3d at 970; *AlixPartners*, 2022 WL 1111404, at *18.

Montway asserts that Navi is both registered in Delaware and has its principal place of business there. Compl. ¶ 11. As a result, Montway says, Navi misappropriated its trade secrets "in" Delaware. D.I. 20 at 17. But that threadbare allegation is not enough to state a claim under the DUTSA. The complaint does not allege that Navi's theft of Montway's leads or Navi's outreach to Montway's potential customers happened in Delaware. Far from it: The only two Navi employees referred

15

to in the complaint are Karakostov and Tzakov, and according to the complaint, both men resided in Bulgaria during the relevant period. Compl. ¶¶ 12–13. And the effects of the misappropriation were most likely felt in Illinois (where Montway is headquartered) and Bulgaria (where MDG EOOD is headquartered). *Id.* ¶¶ 8–9. So even viewing the facts in the complaint most favorably to Montway, the misappropriation seems to have happened in Bulgaria, or possibly Illinois.

To be sure, at least one Delaware case has applied the DUTSA "when the misappropriating acts were scattered all over the country" and "did not happen in a single identifiable place." *JPMorgan*, 765 F. Supp. 3d at 380 (discussing *J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*, 1988 WL 116423, at *1 (Del. Super. Ct. Oct. 21, 1988)). Montway urges me to apply that exception here, since Defendants' "business is nationwide." D.I. 20 at 17. But that argument conflates downstream *business transactions* with *misappropriation*. The fact that Navi enters contracts with customers around the country is irrelevant to the question of where the misappropriation occurred. And according to the complaint, the misappropriation happened in Bulgaria or Illinois. I need not decide between them; the complaint fails to allege misappropriation in Delaware, so I dismiss the DUTSA claim against Navi. But I do so without prejudice so that Montway can add more facts that could support applying Delaware law to Navi's conduct.

## IV. MONTWAY STATES A LANHAM ACT FALSE-ADVERTISING CLAIM

Montway also argues that Navi violated the Lanham Act by posting fake reviews and false information about its business online. Compl. ¶¶ 93–104. The Lanham Act broadly bans false advertising. 15 U.S.C. § 1125(a); 16 C.F.R. § 465.2. To make out a

false-advertising claim, a plaintiff must first assert that it has statutory standing to sue under the Act. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). It then must allege the substantive elements of the claim. *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 872 (3d Cir. 1992).

Some courts have concluded that false-advertising claims have a "slightly heightened" pleading standard somewhere between Rule 8's notice pleading standard and Rule 9(b)'s particularity requirement for fraud claims. *Trans USA Prods., Inc. v. Howard Berger Co.*, 2008 WL 852324, at *5 (D.N.J. Mar. 28, 2008) (quoting *Max Daetwyler Corp. v. Input Graphics, Inc.*, 608 F. Supp. 1549, 1556 (E.D. Pa. 1985)) (explaining that "[i]n litigation in which one party is charged with making false statements, it is important that the party charged be provided with sufficiently detailed allegations regarding the nature of the alleged falsehoods to allow him to make a proper defense").

Neither the Supreme Court nor the Third Circuit has ever adopted an "intermediate" pleading standard for Lanham Act false-advertising claims, and courts in this District have been skeptical that such a standard applies. *See, e.g.*, *Shure Inc. v. Clearone, Inc.*, 2020 WL 2839294, at *5 n.16 (D. Del. June 1, 2020), *report and recommendation adopted sub nom.* 2020 WL 8258362 (D. Del. June 18, 2020). Though I have doubts about the intermediate standard, both Montway and Defendants agree that it applies here. *See* D.I. 18 at 20–21; D.I. 20 at 18. So I evaluate the complaint under that standard. *See N. Atl. Imports, LLC v. Loco-Crazy Good Cookers, Inc.*, 2024 WL 245955, at *3 n.2 (D. Del. Jan. 23, 2024), *report and*

*recommendation adopted sub nom.* 2024 WL 3342309 (D. Del. Apr. 15, 2024). Even under a heightened standard, I conclude that Montway has stated a Lanham Act claim against Navi.

### A. Montway has alleged statutory standing

To have standing to assert a Lanham Act claim, a plaintiff must show that it is within the "zone of interests" protected by the statute by asserting (1) "injury to a commercial interest in reputation or sales" that (2) is "proximately caused" by the defendant's violation of the statute. *Lexmark*, 572 U.S. at 132. Montway easily satisfies both elements.

Begin with injury. According to Montway, Navi's website contains false information designed to "create an appearance of legitimacy … in the hopes of duping potential customers who it contacted by stealing Montway's trade secret information." Compl. ¶ 67. That information, Montway says, causes it "competitive[] injur[y]" by "diverting Montway's sales to customers to Navi." *Id.* ¶ 101. So Montway asserts harm in the form of lost sales—the quintessential commercial injury. *See Unlimited Cellular, Inc. v. Red Points Sols. SL*, 677 F. Supp. 3d 186, 201 (S.D.N.Y. 2023) (noting that harm to "sales and reputation" is an injury to a "commercial interest").

Next, consider proximate cause. Montway's theory of the case is that Navi steals Montway's customers by sending unsolicited, cheaper quotes to individuals who have asked Montway for quotes. *See, e.g.*, Compl. ¶ 40. Those individuals presumably go to Navi's website after getting the unsolicited quote, see what appear to be positive reviews and statements about Navi's experience shipping autos, and decide to do

18

business with Navi instead of Montway. In other words, Navi allegedly targets Montway's potential customers *in particular*. So it is those customers who are most affected by the alleged false statements on Navi's website. That satisfies proximate cause. *See Lexmark*, 572 U.S. at 133 (noting that proximate cause is satisfied where the "deception of consumers causes them to withhold trade from the plaintiff"); *Frompovicz v. Niagara Bottling, LLC*, 337 F. Supp. 3d 498, 506 (E.D. Pa. 2018) ("Because [the plaintiff] and [the defendant] are direct competitors, [the plaintiff's] loss of sales flows directly from, and is thus proximately caused by, [the defendant's] violation of the statute.").

## B. Montway has alleged the other elements of a false-advertising claim

To make out a false-advertising claim, a plaintiff with standing must also plead: (1) "that the defendant has made false or misleading statements as to his own product;" (2) "that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience;" (3) "that the deception is material in that it is likely to influence purchasing decisions;" (4) "that the advertised goods travelled in interstate commerce;" and (5) "that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Ditri*, 954 F.2d at 872 (quoting *U.S. Healthcare v. Blue Cross of Gr. Phila.*, 898 F.2d 914, 922–23 (3d Cir. 1990)). Montway has alleged enough facts to satisfy the first, third, fourth, and fifth elements. It does not need to satisfy the second because it claims that Navi made statements that are "literally false," not just misleading. *See Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 136 (3d Cir. 2005).

*1. The complaint specifically identifies the false statements at issue.* Montway claims that Navi posted "entirely fabricated" reviews from "purported satisfied customers of Navi's services" that "used generic names, repeated (almost verbatim) the same generic praise about Navi's services, and gave Navi a five-star rating. Compl. ¶ 63. The complaint then provides screenshots of specific reviews: three near-identical reviews posted by individuals with three different names within the period of several weeks in 2024, more near-identical reviews posted by individuals with the same three names months later, and repostings of those exact reviews a few months after that. *Id.* ¶¶ 64–65. The suspicious timing and wording of those reviews makes their falsity plausible.

Montway also says that Navi posted "fake reviews" by "real people" about its services. Compl. ¶ 66. As an example, the complaint shows a screenshot of a glowing review posted by an alleged ex-Montway employee "who had never used Navi's services." *Id.* That screenshot makes Montway's claim about "fake reviews" by "real people" plausible.

Finally, the complaint alleges that Navi falsely claims to have "shipped 'over 20,000 vehicles.'" *Id.* ¶ 68. The complaint has a screenshot of the part of Navi's website making that claim. *Id.* To be sure, the allegation and the screenshot, standing alone, contain no facts supporting the inference that the 20,000 number is false. But other parts of the complaint give rise to that inference. For instance, the complaint claims that fewer than 125 people visit Navi's website each month and that Navi has only been in business since May 2024. *Id.* ¶¶ 31, 37. The minimal web traffic and short period of time Navi has been in business make it plausible, if not probable, that Navi has shipped fewer than 20,000 vehicles.

Montway describes Navi's allegedly false statements with enough particularity to satisfy the intermediate pleading standard. In *North Atlantic Imports*, for instance, the court found the intermediate pleading standard met where the complaint "offer[ed] excerpts of [the] advertisements and product manuals featuring the alleged misrepresentations about the … technology" at issue. 2024 WL 245955, at *3. Conversely, in *Trans USA Products*, the court dismissed the complaint for failing to identify the exact devices the defendants "allegedly sold that bore counterfeit marks." 2008 WL 852324, at *6. Montway's complaint contains comparable detail to the complaint in *North Atlantic Imports* and significantly more detail than the complaint in *Trans USA*. That level of detail is enough under the intermediate pleading standard.

2.   *The complaint contains facts sufficient to infer that the false statements were material to Navi customers' buying decisions*. Montway says that the false information Navi posted online "create[s] the impression that it [is] a legitimate business," and that it was engineered to "deceive customers into believing that Navi is a reputable car transportation business with stellar service." Compl. ¶¶ 63, 67. It also alleges that Navi directly competes with Montway. *Id.* ¶ 35. "Construing these allegations in the light most favorable to [Montway], it is reasonable to infer that customers would consider [Navi's] false advertisements material to their purchasing decisions when faced with two similar, directly competing [services]." *N. Atl. Imports*, 2024 WL 245955, at *3.

3.   *The allegations in the complaint, if true, would easily satisfy the Lanham Act's interstate-commerce requirement*. Montway alleges that Navi's car-transport services are "advertised, promoted, sold, and distributed in interstate commerce." Compl.

21

¶ 100. And the genuine customer reviews excerpted in the complaint support an inference that Navi's business is nationwide. *See id.* ¶ 52 (referring to jobs moving vehicles from Florida to Wisconsin, Florida to Virginia, and Maryland to Florida). The commerce requirement "has been broadly interpreted." *U.S. Healthcare*, 898 F.2d at 922. Montway has met it here.

*4. The complaint says that Navi's false advertising has harmed and will continue to harm Montway.* Montway and Navi, the complaint emphasizes, compete with one another for the same business. Compl. ¶ 36. So the apparently legitimate, reputable website presumably contributes to customers' deciding to contract with Navi instead of Montway. *Id.* ¶ 63; *see Cambria Cnty. Ass'n for the Blind & Handicapped, Inc. v. Affordable Wire Mgmt., LLC*, 2024 WL 1328883, at *4 (D. Del. Mar. 28, 2024) (concluding that plaintiff had stated a Lanham Act false-advertising claim where it "direct[ly] compet[ed]" with defendant and asserted that defendant's false advertising had "influence[d] customers' purchasing decisions, resulting in lost sales, lost market share, lost business opportunities, and loss of goodwill"); *Eyenavision, Inc. v. EnChroma, Inc.*, 2022 WL 783428, at *7 (W.D. Pa. Mar. 15, 2022) (declining to dismiss Lanham Act false-advertising claim where parties' products were "in direct competition with one another" and defendants' alleged false representations were "likely to influence consumers' buying decisions when choosing which [product] to purchase").

### C. Defendants' contrary arguments fail

Defendants argue that Montway's Lanham Act claim has two critical flaws. *First*, they say that the complaint fails to allege that Navi actually made false statements, instead merely asserting that Navi's reviews "appear[] likely" to be "fabricated," and

that Navi's claim about shipping more than 20,000 vehicles "appears to be false." D.I. 18 at 21 & n.3 (emphasis deleted). At the outset, Defendants overstate things. The complaint flatly asserts that "Navi posted fake reviews." Compl. ¶ 94. And in any event, Defendants' argument confuses what Montway needs to *plead* with what it needs to prove later on. At the pleading stage, Montway only needs to allege facts raising a "plausible inference" that Navi's advertising is "literally false." *Unlimited Cellular*, 677 F. Supp. 3d at 202. By highlighting particular statements on Navi's website and explaining why they are likely false, Montway has satisfied its pleading burden. *See supra* Part IV.B. To be sure, if it turns out after discovery that Navi's customer reviews were legitimate, or that it has in fact shipped more than 20,000 cars, Montway's false-advertising claim will run into problems. But trying to litigate that issue now puts the cart before the horse.

*Second*, Defendants claim that Montway fails to allege a likelihood of injury. Defendants observe that according to Montway's own complaint, Navi's website gets only 125 visitors a month. D.I. 18 at 22 (quoting Compl. ¶ 37). If that is so, Defendants continue, then "any potential harm" to Montway from the false statements on the website "is … de minim[i]s." *Id.* Maybe so, but irrelevant: The Lanham Act does not have a de minimis exception. *See Am. Fireglass v. Moderustic, Inc.*, 365 F. Supp. 3d 1062, 1083 (S.D. Cal. 2019).

Plus, the allegations about Navi's minimal website traffic and about the likelihood of harm to Montway are wholly consistent. Montway says that Navi targets its prospective customers using misappropriated trade secrets—namely, information about those

23

customers' identity and contact information passed to it by contacts at Montway. Compl. ¶ 52. Assuming the truth of those allegations and drawing reasonable inferences from them in Montway's favor, as I must, most of the monthly visitors to Navi's site are likely prospective Montway customers who have gotten unsolicited Navi quotes. *Id.* ¶ 67. If even some of those visitors decide, after reading the statements on Navi's website, to do business with Navi instead of Montway, that obviously harms Montway more than a little. So I let Montway's Lanham Act claim proceed against Navi.

## V.    I Let Montway's DTSA Claim Against Karakostov and Tzakov Proceed, but Dismiss the DUTSA Claim Against Them

Montway also asserts DTSA and DUTSA claims against Karakostov and Tzakov themselves. *See* Compl. ¶¶ 16–19. Montway "does not try to pierce the corporate veil. Instead, it alleges that [Karakostov] and [Tzakov] directly took par[t] in the misappropriation and so are directly liable." *JPMorgan*, 765 F. Supp. 3d at 381 (citation omitted). Karakostov and Tzakov move to dismiss, arguing that the allegations against them are "threadbare" and "conclusory" and that the vast majority of the allegations in the complaint concern Navi. D.I. 18 at 23.

"Courts in the Third Circuit follow three steps to discern whether complaints plausibly state a claim: (1) note the elements of the plaintiff's cause of action; (2) cross out any allegations that are 'no more than conclusions'; then (3) take the remaining well-pleaded allegations, assume that they are true, and decide 'whether they plausibly give rise to an entitlement to relief.'" *JPMorgan*, 765 F. Supp. 3d at 381 (quoting *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016)). "The claim survives if, drawing all inferences in the plaintiff's favor, his allegations 'nudge[] [its]

claim[] across the line from conceivable to plausible.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Following those steps, I conclude that Montway has stated a DTSA claim, but not a DUTSA claim, against Karakostov and Tzakov.

### A. Montway states a DTSA claim against both Karakostov and Tzakov

Recall that to make out a DTSA claim, Montway must allege (1) trade secrets (2) connected to interstate commerce (3) that Karakostov and Tzakov misappropriated. As explained, Montway has adequately alleged the existence of trade secrets in the identities and contact information of its potential customers (but not the quotes it provides to them). *See supra* Part II. It has also adequately alleged a connection to interstate commerce. *See id.* That leaves misappropriation. One way a defendant can commit misappropriation is by getting someone else's trade secret through "improper means." 18 U.S.C. §1839(5)(A). "Improper means" include "breach or inducement of a breach of a duty to maintain secrecy." *Id.* §1839(6)(A).

The complaint contains several conclusory assertions that Karakostov and Tzakov "received … trade secrets" from contacts at Montway through "improper means" and exploited them for Navi's benefit. *See, e.g.*, Compl. ¶76. The complaint also baldly asserts that Karkostov and Tzakov "control[]" Navi. *Id.* ¶¶12–13. But the complaint also contains more specific allegations that push Montway's conclusory statements over the line from "conceivable" to "plausible."

*First*, the facts in the complaint support an inference that Karakostov and Tzakov are personally responsible for getting Montway's trade secrets. For example, the complaint says that during Karakostov's six years at Montway, he "establish[ed] relationships with Montway's and other auto-transport companies' employees" who

25

could "funnel [him] private information about prospective customers long after he departed." *Id.* ¶ 4. That allegation is plausible given Karakostov's position as a "sales[man] and eventually as a Senior Sales Operations Manager at Montway." *Id.* While the complaint has fewer details about Tzakov, it says that he worked at Montway for nearly three years as an "Account Manager," where he enjoyed "access to Montway's commercially sensitive information." *Id.* ¶ 30. So it is plausible that both Karakostov and Tzakov got contacts through their positions at Montway.

The complaint also suggests that Karakostov and Tzakov exert a lot of control over Navi's operations, since they together "approached a Bulgarian law firm to help them set up a Bulgarian entity to compliment Navi's existing U.S. operation." *Id.* ¶ 5. While it is possible that Navi has other employees who use Navi's contacts at Montway to get leads, the more plausible inference is that Karakostov and Tzakov are the ones actually doing the outreach. Indeed, the complaint does not name any other Navi employees besides Karakostov and Tzakov, a description that Defendants do not dispute. (Indeed, Defendants openly acknowledge that Navi is a "lean[]" operation. D.I. 18 at 6.)

Finally, Montway alleges that Tzakov concealed his true reasons for leaving Montway, instead stating that his departure was for "personal reasons" and "that he was going to take time to reset, travel, read books, and find something new that w[ould] challenge him." Compl. ¶ 32 (cleaned up). To be sure, Tzakov might have had many reasons for lying about his future plans. But given that he began working with Navi while still at Montway, and in light of all the other allegations in the complaint,

it is at least plausible that Tzakov hid the ball because he was interested in personally exploiting his relationship with Montway in some way.

*Second*, the facts in the complaint support an inference that Karakostov and Tzakov knew that Navi's leads had been gained through "improper means." As former Montway employees, both Karkostov and Tzakov were aware of Montway's confidentiality policies, which would have barred current employees from sharing customer leads with Navi. *Id.* ¶ 30. Karakostov and Tzakov both attended training sessions on those policies while employed by MDG EOOD as well. *Id.*

To be sure, the allegations against Karakostov and (especially) Tzakov are thin. "But at this stage, the inferences are plausible, and the complaint need not contain 'detailed factual allegations'—just enough to make [their] liability more than possible." *JPMorgan*, 765 F. Supp. 3d at 382 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009)). Montway has "barely crossed that line." *Id.* So I allow Montway's DTSA claim to proceed against Karakostov and Tzakov to the extent that the claim asserts trade-secrets protection in Montway's leads.

## B. But Montway does not state a DUTSA claim against either Karakostov or Tzakov

The DUTSA, recall, requires that Defendants' misappropriation took place *in Delaware*. *See supra* Part III. I already concluded that the complaint fails to allege that Navi stole Montway's trade secrets in Delaware. *See generally id.* The DUTSA claim against Karakostov and Tzakov has the same issue. According to the complaint, Karakostov and Tzakov both "reside[] in Bulgaria" and are "Bulgarian citizen[s]." Compl. ¶¶ 11–12. Montway does not claim that Karakostov or Tzakov acquired or

used Montway's trade secrets while in Delaware—or that they did anything at all in the state. If the misappropriation occurred anywhere, it occurred in Bulgaria (where the individual defendants reside and where MDG EOOD is based), or potentially in Illinois (where Montway is based). *BP Chemicals* 229 F.3d at 267; *Focus*, 250 A.3d at 970; *AlixPartners*, 2022 WL 1111404, at *18. So I dismiss the DUTSA claim against Karakostov and Tzakov, again without prejudice.

## VI.    MDG EOOD HAS STANDING TO SUE FOR MISAPPROPRIATION, BUT NOT FALSE ADVERTISING

Defendants urge me to dismiss MDG EOOD as a plaintiff for lack of Article III standing. D.I. 18 at 25. "To establish standing ... a plaintiff must demonstrate (1) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant[s], and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Defendants say that MDG EOOD has failed to assert a cognizable injury in fact flowing from their alleged misappropriation of trade secrets and Navi's false advertising. They are partly right and partly wrong.

### A.    MDG EOOD has standing to sue for misappropriation

Defendants argue that MDG EOOD cannot have been injured by Navi's misappropriation because the trade secrets at issue belong to *Montway*, its parent company. D.I. 18 at 25 (quoting Compl. ¶ 8). But the relevant question is not whether MDG EOOD technically *owns* the trade secrets at issue. Rather, it is whether MDG

28

EOOD "lawfully possess[ed]" them. *Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 177 (3d Cir. 2020). An entity in lawful possession of another entity's trade secrets is obviously injured by misappropriation, since trade secrets' value derives from their secrecy.

According to the complaint, MDG EOOD is a "servicing entity" wholly owned by Montway. Compl. ¶ 9. MDG EOOD "employs the sales personnel (including, previously, Karakostov and Tzakov) responsible for much of Montway[] LLC's business." D.I. 20 at 21; *see also* Compl. ¶ 30. And "MDG EOOD … ha[d] lawful possession of Montway[] LLC's trade secrets by virtue of its corporate structure and operating procedures." D.I. 20 at 22. So MDG EOOD, like Montway, was injured when Defendants stole its business. *See Sayer Techs., S.L. v. Viscofan Collagen USA Inc.*, 2025 WL 1549417, at *5 (D.N.J. May 30, 2025) (permitting subsidiary to bring misappropriation claim for parent's trade secrets); *R.R. Donnelly & Sons Co. v. Marino*, 505 F. Supp. 3d 194, 201 (W.D.N.Y. 2020) (finding standing where complaint grouped parent and subsidiary together and "allege[d] misappropriation on behalf of both entities"). MDG EOOD has standing to sue for misappropriation.

**B. MDG EOOD lacks standing to sue for false advertising**

Defendants also argue that the complaint fails to allege "how [Plaintiffs'] Lanham Act claim can be brought [by] MDG EOOD. D.I. 18 at 25. Montway does not contest that argument in its opposition. *See generally* D.I. 20. Nor could it. To be sure, the complaint alleges that "Navi's false and misleading representations" on its website "have competitively injured and are likely to further competitively injure Montway by diverting Montway's sales … to Navi." Compl. ¶ 101. And the complaint uses the

term "Montway" to describe both Montway and MDG EOOD. But according to the complaint, MDG EOOD is just a servicing entity, not necessarily the entity that makes a profit from Montway's customers. And I cannot assume that any loss incurred by Montway (the parent) impacted MDG EOOD (the subsidiary). *Cf. Peacock Med. Lab, LLC v. UnitedHealth Grp., Inc.*, 2015 WL 2198470, at *3 n.4 (S.D. Fla. May 11, 2015) ("While a parent corporation may have standing to bring a claim on behalf of its subsidiary … the converse is not necessarily true").

The complaint needed to provide additional facts showing that MDG EOOD was injured when Montway lost customers due to Navi's supposedly false advertisements. Because it failed to do so, MDG EOOD lacks standing to assert the Lanham Act claim, and I dismiss it as a plaintiff from that claim. Again, I do so without prejudice so that Plaintiffs can amend their complaint to add additional facts if they so choose.

\* \* \* \* \*

Montway and MDG EOOD have stated a claim against Navi, Karakostov, and Tzakov under the federal DTSA, but only for misappropriation of trade secrets in Montway's customer leads and contact information—not its quotes. Additionally, Montway has stated a claim against Navi for false advertising under the Lanham Act. Plaintiffs have failed to state a claim against all three defendants under the DUTSA, so I dismiss that claim without prejudice. And MDG EOOD lacks standing to assert a Lanham Act claim against Navi, so I dismiss it as a plaintiff from that claim, again without prejudice. But I grant Plaintiffs an opportunity to amend their complaint to cure the defects that I have identified.

30