IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MONTWAY LLC d/b/a MONTWAY
AUTO TRANSPORT and MDG EOOD
d/b/a MONTWAY BULGARIA,

*Plaintiffs-
Counterclaim
Defendants,*

v.

NAVI TRANSPORT SERVICES LLC
d/b/a NAVI AUTO TRANSPORT,                     No. 25-cv-00381-SB

*Defendant-
Counterclaim
Plaintiff,*

and

IVAN KARAKOSTOV and RADION
TZAKOV,

*Defendants.*

---

James L. Higgins, Gianna Carina Penezic, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, Delaware; Sanjay K. Murthy, TAFT STETTINIUS & HOLLISTER LLP, Chicago, Illinois.

*Counsel for Plaintiffs-Counterclaim Defendants.*

Emily L. Skaug, Ronald P. Golden III, BAYARD, P.A., Wilmington, Delaware; John R. Fornaciari, Kevin N. Dorn, BAKER & HOSTETLER LLP, Washington, D.C.

*Counsel for Defendant-Counterclaim Plaintiff and Defendants.*

---

**MEMORANDUM OPINION**

March 30, 2026

BIBAS, *Circuit Judge*, sitting by designation.

All is fair in love and war, but not business. A car-shipping company (Montway) accused a competitor (Navi) of poaching its trade secrets, stealing its business, and misleading potential customers. Navi responded by accusing Montway of falsely reporting it to a key industry player for fraud and theft, causing it to lose business and suffer reputational harm. I previously dismissed part of Montway's complaint, concluding that it had stated claims under the federal Defend Trade Secrets Act (DTSA) and Lanham Act, but not the Delaware Uniform Trade Secrets Act (DUTSA). Now Montway moves to dismiss Navi's countercomplaint. I partly grant and partly deny the motion.

## I.    NAVI COUNTERSUES MONTWAY

Vehicle shipping is "resource intensive" and requires "several players to get the job done." *Montway LLC v. Navi Trans. Servs. LLC*, 809 F. Supp. 3d 200, 206–07 (D. Del. 2025). Brokers connect customers to carriers, "the entities who … physically transport a vehicle." *Id.* at 207. A customer "reaches out to a broker," who "responds with a quote and posts the shipping job to a centralized 'load board' viewable by other brokers and carriers." *Id.* CentralDispatch is the industry's leading load board; most brokers use it to match customers and carriers. Countercompl., D.I. 33 ¶¶ 17, 24. When they succeed, they "take[] a cut of the quoted price as a broker's fee." *Montway*, 809 F. Supp. 3d at 207.

Montway is a major broker and has facilitated shipping "more than a million vehicles" in its two-plus decades in business. *Id.* But trouble came to paradise in 2023. That year, one of Montway's longtime salesmen, Ivan "Jerry" Karakostov, quit his job

2

to form a competing business called Navi Transport Services LLC. *Id.* A Montway account manager, Radion "Ruben" Tzakov, soon joined him. *Id.* Together, Karakostov and Tzakov worked to build a brokerage that was "lean, technology-driven," and cheaper than Montway. Countercompl. ¶ 13.

Montway soon started to suspect that Navi was not playing fair. When Montway got a customer inquiry, "it would send the potential customer a quote and record the inquiry in its internal system." *Montway*, 809 F. Supp. 3d at 207. But before "Montway posted the job" to CentralDispatch, "Navi would post the identical job to the load board at a lower price." *Id.* at 207–08. "The customer would then decline Montway's quote." *Id.* at 208. Montway recognized that its potential customers "might be submitting quote requests to Navi as well," with Navi deciding (unlike Montway) to "post potential jobs to the load board before potential customers accepted its quotes." *Id.* But Navi "had next to no internet presence and only a handful of website visitors per month." *Id.* So Montway thought the more likely explanation was that "Karakostov and Tzakov [were] colluding with current Montway employees to get Montway's leads" and the "contact information for its potential customers." *Id.*

Worried about its bottom line, Montway acted quickly to remedy the issue. In February 2025, two of its executives allegedly reached out to CentralDispatch and told it that Navi was "engaged in fraud and other illegal misconduct, including … misappropriating trade secrets owned by Montway." Countercompl. ¶ 40. CentralDispatch then suspended Navi, which had "hundreds of active jobs posted [on the load board] at the time," while it investigated the allegations. *Id.* ¶ 25. Eight days

3

later, CentralDispatch reinstated Navi's access to the platform after concluding that it had "found no evidence of misuse of the [s]ite or other [terms of use] violation[s] by Navi at this time." *Id.* ¶ 34.

Soon after, Montway sued Navi, Karakostov, and Tzakov under the DTSA and DUTSA, accusing it of misappropriating its customer leads, quotes, and contact information. *See generally* Compl., D.I. 1 ¶¶ 69–92. Montway also accused Navi of false advertising in violation of the Lanham Act, based on material on Navi's website that appeared to be misleading or fabricated. *Id.* ¶¶ 93–104. I dismissed the DUTSA claim, and dismissed a Montway subsidiary, MDG EOOD, as a plaintiff from the Lanham Act claim because it lacked standing to sue. *Montway*, 809 F. Supp. 3d at 220–21. I let the DTSA claim proceed, "but only for misappropriation of trade secrets in Montway's consumer leads and contact information." *Id.* at 220. I also let the Lanham Act claim go forward. *Id.*

After I ruled on Defendants' motion to dismiss, Navi answered and countersued Montway for reporting it to CentralDispatch. Navi said that Montway had tortiously interfered with its business relations and its contract with CentralDispatch. It also alleged that Montway had committed trade libel by "falsely stat[ing] that Navi was engaged in fraud, misuse, or other misconduct which violated [CentralDispatch's] terms of use." Countercompl. ¶ 56; *see also id.* ¶¶ 42–54. Navi claimed that its suspension from the load board had led it to "lo[se] bookings, potential bookings, and … profit" and "caused [it] serious reputational harm." *Id.* ¶¶ 42–43. Montway has moved to dismiss the countercomplaint for failure to state a claim. *See* D.I. 36–37;

4

Fed. R. Civ. P. 12(b)(6). "In reviewing the motion, I must 'accept as true all well-pled allegations and construe the [counter]complaint in the light most favorable to [Navi].'" *Montway*, 809 F. Supp. 2d at 208 (quoting *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 253 (3d Cir. 2009)).

## II.    *NOERR-PENNINGTON* DOES NOT IMMUNIZE MONTWAY

As a threshold matter, Montway claims immunity from liability on all three of Navi's counterclaims because they "seek to hold [it] liable for reporting its allegations of trade secret misappropriation to CentralDispatch." D.I. 37 at 8. That reporting, Montway says, was "privileged under the First Amendment and the *Noerr-Pennington* doctrine." *Id.* But *Noerr-Pennington* does not extend to communications with third parties that do not threaten litigation. So the communications were not privileged and Montway is not immune.

### A. *Noerr-Pennington* protects the right to petition the government

The First Amendment prohibits state action that abridges "the right of the people … to petition the Government for a redress of grievances." U.S. Const. amend. I. The *Noerr-Pennington* doctrine safeguards that right. It originated in two Supreme court cases from the 1960s holding that "[a] party who petitions the government for redress generally is immune from antitrust liability." *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir. 1999) (discussing *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) & *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965)). But lower courts later extended the doctrine to "offer protection to citizens' petitioning activities in contexts outside the antitrust area." *We, Inc. v. City of Phila.*, 174 F.3d 322, 326–27 (3d Cir. 1999). For example,

5

"courts have applied [the] doctrine universally to business torts" like tortious interference and unfair competition. *Anthrocare Corp. v. Smith & Nephew, Inc.*, 2004 WL 896002, at *3 (D. Del. Mar. 10, 2004) (citing *Cheminor*, 168 F.3d at 128–29). So today, *Noerr-Pennington* generally immunizes persons who petition the government from liability for claims alleging that the petitioning activity harmed someone else's business.

### B. *Noerr-Pennington* does not protect activity unconnected to petitioning the government

Even though its reach has expanded over time, *Noerr-Pennington* has limits. It is a "label for a form of First Amendment protection" grounded in the Petition Clause. *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000); *see also We, Inc.*, 174 F.3d at 326 (noting that "[i]mmunity from liability is necessary so as not to chill the exercise of [the petition] right"). And the Petition Clause protects only petitions to government entities. *See* U.S. Const. amend. I; *Mirabella v. Willard*, 853 F.3d 641, 649 (3d Cir. 2017) ("[T]he Petition Clause protect[s] … expression directed towards the government for the specific purpose of asking it to right a wrong."). Many types of government entities count: *Noerr-Pennington* immunizes petitions to "legislatures, administrative agencies, and courts" alike. *Anthrocare*, 2004 WL 896002, at *3 (citing *Calif. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)); *see also A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239, 250 (3d Cir. 2001). But *Noerr-Pennington*, like the First Amendment itself, does not cover petitions to private entities.

"[F]or the *Noerr-Pennington* doctrine to apply in this case," then, Montway "would need to have a First Amendment right to report" Navi to CentralDispatch for alleged terms-of-service violations. *Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 525 F. Supp. 3d 1145, 1240 (S.D. Cal. 2021). Montway has no such right because CentralDispatch "is not the government." *LY Berditchev, Corp. v. Truss Cosmetics Corp.*, 2023 WL 334539, at \*9 (D.N.J. Jan. 20, 2023). As Montway acknowledges, it is a "load board … owned and operated by Cox Automotive," a private corporation. Compl., D.I. 1 ¶ 21. So there is "no right to petition [CentralDispatch] with which [Navi's counterclaims] would interfere." *LY Berditchev*, 2023 WL 334539, at \*9.

Perhaps aware that its immunity claim is fatally flawed, Montway argues that its communications with CentralDispatch fall within *Noerr-Pennington* because they were "incidental" to Montway's suit against Navi, the filing of which *is* protected by the Petition Clause. *See* D.I. 37 at 8. Montway is right that courts have applied *Noerr-Pennington* to activities "incidental" to litigation, like sending "presuit letters" to a would-be defendant that "threaten[] legal action and mak[e] legal representations." *Sweet Street Desserts, Inc. v. Chudleigh's, Ltd.*, 655 F. App'x 103, 110 (3d Cir. 2016) (first quotation); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 940 (9th Cir. 2006) (second and third ones). But Montway stretches the word "incidental" beyond recognition.

The Third Circuit has never opined on when conduct is "incidental" enough to litigation to be covered by *Noerr-Pennington*, noting only that "prelitigation threat letters" sent to a potential defendant might qualify. *A.D. Bedell*, 263 F.3d at 252. That dictum is no help to Montway, which did not threaten litigation against

7

CentralDispatch but instead "alerted [it] to the conduct giving rise to Montway's claim for trade secret misappropriation." D.I. 37 at 13; *see also* D.I. 40 at 9 ("Montway falsely reported Navi for fraud and other misconduct to [CentralDispatch] so that [it] would remove Navi from the platform in order to run Navi out of business.").

I decline to extend *Noerr-Pennington* to the sort of communication that Montway allegedly had with CentralDispatch. *Noerr-Pennington* immunizes actions "incidental" to filing a lawsuit because holding a plaintiff liable for "prelitigation conduct when the same demands asserted in a petition to the court [would be] protected would render the entire litigation process more onerous," indirectly burdening the plaintiff's rights under the Petition Clause. *Sosa*, 437 F.3d at 936. That rationale falls apart when applied to a plaintiff's correspondence with third parties whom the plaintiff has not threatened to sue. Letters sent to "third parties who are not directly threatened with litigation are … unrelated to [one party's] ability to petition a court for redress for [another party's] wrongdoing." *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1132 (D. Minn. 2016). So the First Amendment is not served by immunizing a party for sending them.

Courts from around the country have recognized as much, holding that *Noerr-Pennington* does not apply to third-party correspondence that does not threaten litigation. *See, e.g., Thimes Sols., Inc. v. TP Link USA Corp.*, 2022 WL 1125628, at *2 (9th Cir. Apr. 15, 2022); *Golden Eye Media*, 525 F. Supp. 3d at 1240; *Ontel Prods. Corp. v. Zuru LTD*, 2017 WL 4444198, at *3 (D.N.J. Oct. 5, 2017); *Republic Tobacco, L.P. v. N. Atl. Trading Co.*, 1999 WL 1270681, at *1 n.2 (N.D. Ill. Dec. 27, 1999). I

agree. Montway and CentralDispatch did not have a dispute, so letting Navi sue Montway for its communications with CentralDispatch cannot burden Montway's right to petition a court to remedy such a dispute. That torpedoes Montway's claim of *Noerr-Pennington* immunity: The doctrine simply does not apply to the correspondence that is the subject of Navi's counterclaims. As a result, I do not reach Navi's fallback argument that even if *Noerr-Pennington* applied, it would not protect Montway because Montway's lawsuit is "objectively baseless." *See* D.I. 40 at 17; *see also Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 51 (1993) (describing "sham" exception to *Noerr-Pennington*).

### III.    I PARTLY DISMISS NAVI'S COUNTERCLAIMS

The crux of Navi's countercomplaint is that Montway intentionally harmed Navi's business when it told CentralDispatch that Navi had poached Montway's trade secrets. Navi says that conduct amounted to tortious interference with its business relations, trade libel, and tortious interference with its contract with CentralDispatch. *See* Countercompl. ¶¶ 52–64. It argues that Delaware law governs all three claims, which Montway does not dispute. *See id.* ¶ 11; D.I. 37 at 15, 16, 18. So I analyze Navi's counterclaims under Delaware law. *See In re American Intern. Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 882 n.17 (Del. Ch. 2009). Doing so, I let the first tortious-interference count and the trade-libel count proceed. I dismiss the second tortious-interference count.

#### A. Navi states a claim for tortious interference with business relations

To plead tortious interference with business relations in Delaware, a plaintiff must allege: (1) "the reasonable probability of a business opportunity"; (2) "the

9

intentional interference by defendant with that opportunity"; (3) "proximate causation"; and (4) "damages." *Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001) (internal quotation marks omitted). Additionally, a defendant's actions must go beyond its privilege "to compete or protect his business interests in a fair and lawful manner." *Id.* (internal quotation marks omitted).

*1. Navi alleges the elements of tortious interference with business relations.* According to the countercomplaint, Navi had "hundreds of active jobs posted" on CentralDispatch when it was suspended. Countercompl. ¶ 25. Navi says that those posts would have likely led to more business for the company, since brokers and carriers generally use load boards like CentralDispatch to offer and accept vehicle-shipping jobs, and CentralDispatch far exceeds its competitors in "industry penetration." *Id.* ¶¶ 18, 21, 24. That amounts to a "reasonable probability of a business opportunity." *See Orthopaedic Assocs. of S. Del., P.A. v. Pfaff*, 2018 WL 822020 (Del. Super. Ct. Feb. 9, 2018) (noting that while a complaint need not identify potential customers by name, it "must allege enough detail for the [c]ourt to be able to infer the existence of specific parties who presented an existing or potential business opportunity").

Navi also alleges that Montway intentionally interfered with its potential business by "caus[ing] [CentralDispatch] to cut off Navi's access" with the goal of "run[ning] Navi out of business." *Id.* ¶¶ 39, 41. And Navi alleges that the report and resulting suspension caused various injuries: Navi "dispatched significantly fewer orders," delivered existing orders "more slowly," "lost bookings, potential bookings,

and … profit," and suffered "serious reputational harm, both internally and externally." *Id.* ¶¶ 42–43. Plus, if Navi is right that Montway made "baseless" reports to CentralDispatch to harm Navi's business, that conduct likely went beyond its "right to compete in the market." *Tongwei Solar Hefei Co. Ltd., Inc. v. Solaria Corp.*, 2022 WL 606290, at *2 (D. Del. Jan. 21, 2022); *see also DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1154 (Del. 1981) (citing Restatement (Second) of Torts § 767 (1979)) (describing privilege).

Finally, Navi alleges proximate cause between the report and its resulting injuries. Somewhat confusingly, Delaware courts analyze proximate causation using the so-called "but for" rule, which provides that proximate cause is the "direct cause without which [an injury] would not have occurred." *Chudnofsky v. Edwards*, 208 A.2d 516, 518 (Del. 1965). Navi's allegations satisfy that standard, because without Montway's report, "the incident" giving rise to the countercomplaint "would not have happened." *Preston Hollow Capital LLC v. Nuveen LLC*, 2020 WL 1814756, at *15 (Del. Ch. Apr. 9, 2020). CentralDispatch would not have suspended Navi, and Navi probably would not have lost existing or future jobs or suffered reputational harm. Said another way, the suspension and resulting harm were direct products of Montway's alleged actions. *Cf. id.* at *16 (concluding that plaintiff pleaded proximate cause when defendant "went to … [third parties] and gave them a clear message, and in response the [third parties] took actions that curtailed the business expectancies of" plaintiff); *IronRock Energy Corp. v. Pointe LNG, LLC*, 2021 WL 3503807, at *6 (Del. Super. Ct. July 19, 2021) (concluding that plaintiff pleaded proximate cause

11

where defendant falsely promised to help it get a critical contract, and third parties responded by refusing to lend plaintiff money for a federal permit it needed). So I let Navi's tortious interference with business relations claim proceed.

*2. Montway's proximate-cause arguments fail.* Montway disputes that Navi has alleged proximate cause, arguing that "the source of Navi's alleged harm [was] not Montway's statements, but CentralDispatch's independent decision to suspend Navi's account." D.I. 37 at 14. According to Montway, that decision was a "superseding" cause of Navi's injuries. *Id.* at 19. Not so.

Montway is correct that a defendant cannot be liable for an injury attributable to a superseding cause. *See Duphily v. Delaware Elec. Co-op., Inc.*, 662 A.2d 821, 833 (Del. 1995) (quoting *Culver v. Bennett*, 588 A.2d 1094, 1097 (Del. 1991)) ("[A] proximate cause is one 'which in natural and continuous sequence, unbroken by any efficient intervening [superseding] cause, produces the injury and without which the result would not have occurred.'"). But to qualify, a third party's act must be "either unforeseeable, or … foreseeable [and] conducted in an extraordinarily negligent manner." *Delaware Elec. Co-op., Inc. v. Duphily*, 703 A.2d 1202, 1209 (Del. 1997). And here, CentralDispatch's decision to suspend Navi was entirely foreseeable to Montway given its accusations of "fraud and other illegal misconduct, including … reporting that Navi was misappropriating trade secrets." Countercompl. ¶ 40. In fact, taking the countercomplaint's allegations as true, suspension was Montway's *goal* in making the report. *See id.* ¶ 41. And nothing in the countercomplaint suggests that CentralDispatch was negligent (let alone extraordinarily negligent) in reaching its suspension decision.

12

Montway also cites two cases that it claims undermine any inference of proximate cause, but both are inapt. In one, the FDA rescinded its approval of a pharmaceutical manufacturer's generic drugs after concluding that it had filed false applications. *See Barr Lab'ys, Inc. v. Quantum Pharmics, Inc.*, 827 F. Supp. 111, 115 (E.D.N.Y. 1993). A competitor brought a civil RICO claim against the manufacturer, arguing that it would have sold more of its own drugs had the manufacturer's drugs been off the market earlier. *Id.* The court found no direct link between the false applications and the plaintiff's decreased market share, and thus no proximate cause, because the FDA separately rescinded its approval of the drug and customers stopped buying it. *Id.* at 116. But here, Montway targeted Navi directly, and the resulting suspension caused Navi reputational injuries, as well as the loss of at least a portion of the "hundreds of active jobs [it had] posted" at the time of the suspension. Countercompl. ¶ 25; *see also id.* ¶¶ 42–43. Those injuries are a far cry from the "indirect" and "speculative" harms at issue in *Barr*. *Barr*, 827 F. Supp. at 116.

Montway's second case fares no better. In *Dow Chemical v. Exxon Corp.*, an oil company allegedly obtained patents through fraud. 30 F. Supp. 2d 673, 695 (D. Del. 1998). It then aggressively asserted its patent rights, "improv[ing] its competitive position in the polyethylene market at the expense of its competitors." *Id.* A competitor brought a civil RICO claim against the company, asserting that its fraud caused the competitor to lose market share. *Id.* The court dismissed the claim on proximate-cause grounds. *Id.* at 695–96. But the harm in *Dow Chemical* turned on discretionary actions by the Patent and Trademark Office, among others, so the case

is just as inapplicable as *Barr*. *See id.* at 696. Navi's asserted harms are not comparably speculative. As a result, I let Montway's counterclaim for tortious interference with business relations proceed.

**B. Navi states a claim for trade libel**

To make out a claim for trade libel, Navi needed to plead: (1) that Montway "knowingly or recklessly lied about [Navi's] business"; (2) "that [Montway] intended to cause [Navi] a financial loss"; and (3) "that [Navi] in fact suffered that loss." *Tongwei Solar*, 2022 WL 606290, at \*2 (citing *Incyte Corp. v. Flexus Bioscis., Inc.*, 2017 WL 7803923, at \*7 (Del. Super. Ct. Nov. 1, 2007)).

*1. Navi pleads all three elements of trade libel.* On Navi's telling, Montway leadership "falsely reported allegations that Navi was engaged in fraud and other illegal misconduct," "result[ing] in Navi's suspension from the [CentralDispatch] platform." Countercompl. ¶ 40. Navi says those accusations were reckless or knowingly false because Montway "presented no actual evidence to employees of any improper activity by Navi, its employees, or its business practices." *Id.* ¶ 41. According to Navi, Montway's intent in making its report was to cause a financial loss—to "run Navi out of business." *Id.* And Navi says that its suspension from CentralDispatch led to "significantly fewer orders," harming its business. *Id.* ¶ 42. Those allegations state a claim. *Cf. Tongwei Solar*, 2022 WL 606290, at \*2 (allowing trade-libel claim to proceed where defendant told plaintiff's customers that plaintiff was infringing its patents, but could not "identify any specific examples of patent infringement").

*2. Montway's counterarguments are unavailing.* Montway protests that Navi's allegations are too "vague and conclusory" to provide it "meaningful notice about what

14

statements were allegedly false." D.I. 37 at 16. But Montway misunderstands the pleading standard. In federal court, "a complaint survives Rule 8 dismissal if it contains sufficient factual allegations to provide fair notice of the claims and the grounds on which they rest." *Davis v. Neal*, 2023 WL 5289445, at *2 (D. Del. Aug. 17, 2023) (Ambro, J., sitting by designation). And here, the countercomplaint adequately puts Montway on notice that Navi's trade-libel claim arises from the statements it allegedly made to CentralDispatch that caused Navi's suspension. *See* Countercompl. ¶ 40. That is enough; if the claim turns out to be meritless, I "can easily dispose of [it] on a motion for summary judgment." *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005).

Next, Montway suggests that it could not have acted recklessly or knowingly because it has stated a claim against Navi for trade-secrets misappropriation. *See* D.I. 37 at 18 (citing *Montway*, 809 F. Supp. 3d at 213). That confuses alleged facts for proven facts. If the allegations in Montway's complaint are true, then it probably had a basis for reporting Navi to CentralDispatch. But that is impossible to know without discovery. It is also possible that Navi did not misappropriate anything and that Montway reported it to CentralDispatch out of animus. *See* Countercompl. ¶¶ 36–38. Which of those two accounts is true is a matter for summary judgment or trial; I cannot resolve it on a motion to dismiss.

Lastly, Montway says that the countercomplaint's lack of detail makes it impossible to assess the "threshold" issue of "whether [the] alleged libelous statements were actionable statements of fact or unactionable opinions." D.I. 37 at 16. That overstates things. At the outset, it is not even clear that Delaware law

15

exempts opinions from trade-libel liability. No state case takes that position. And the Restatement (Second) of Torts, from which Delaware draws its definition of trade libel, "does not purport to lay down a specific rule on th[e] issue." Restatement (Second) of Torts § 623A cmt. e (1977); *see also Incyte*, 2017 WL 7803923, at *7 n.44. With that said, Delaware draws a distinction, for defamation and libel purposes, between pure opinions (nonactionable) and factual assertions or opinions premised on "undisclosed defamatory facts" (actionable). *Cousins v. Goodier*, 283 A.3d 1140, 1155 (Del. 2022). Pure statements of opinion are "protected under the First Amendment" and thus nonactionable. *See Riley v. Moyed*, 529 A.2d 248, 251 (Del. 1987) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974)). So I assume without deciding that at least some opinions are unactionable in the trade-libel context too.

But Montway is wrong that the countercomplaint makes it impossible to assess whether its allegedly libelous statements were facts or opinions. At the pleading stage, all Navi had to do was plausibly allege that CentralDispatch "would regard [Montway's statements] as [something] other than an expression of [its] opinion." *Agar v. Judy*, 151 A.3d 456, 485 (Del. Ch. 2017). Navi's countercomplaint clears that hurdle. According to the countercomplaint, Montway told CentralDispatch that "Navi was engaged in fraud and other illegal misconduct, including … that Navi was misappropriating trade secrets owned by Montway LLC and used by MDG EOOD." Countercompl. ¶ 40. In Delaware, courts assess whether a statement is an opinion by looking at its "objective verifiability, which … [is] the *sine qua non* of defamation actions," as well as "the common usage, context, and social setting of a statement."

16

*Cousins*, 283 A.3d at 1156. Courts consider the statement "from the perspective of an ordinary reader." *Riley*, 529 A.2d at 251.

All those considerations show that Montway's statements to CentralDispatch, if true, are actionable facts. *First*, the statements are objectively verifiable: Navi either committed fraud and "other illegal misconduct" or it did not, and it either got its business by poaching Montway's leads or through some other means. *Second*, an ordinary person reading Montway's statements would read them as accusing Navi of committing various torts. To be sure, if Navi had alleged only that Montway vaguely accused it of "fraud" or "illegal misconduct," the issue would be closer. *Cf. Gill v. Delaware Park, LLC*, 294 F. Supp. 2d 638, 647 (D. Del. 2003) (treating as nonactionable opinion an accusation that plaintiff was a "liar"). But Navi did more than that: It specifically alleged that Montway falsely accused it of stealing trade secrets and using them to gin up business for itself. *See* Countercompl. ¶ 40. *Finally*, the context and social setting of the statements suggest that they are facts. According to the countercomplaint, Montway reported Navi to CentralDispatch to get it to investigate Navi and potentially kick it off of the load board. *Id.* ¶¶ 36–41. Since the alleged statements was made in the context of a request to initiate an investigation, it is unlikely that they were merely "fiery rhetoric or hyperbole." *Riley*, 529 A.2d at 253 n.5.

Of course, Montway may not have said what Navi claims it said. If so, the parties will have a chance to further litigate the opinion issue after discovery. Discovery may also reveal that Montway's accusations of misappropriation were accurate, which would defeat Navi's trade-libel claim. But for present purposes, I assume the truth of

17

the allegations in Navi's countercomplaint and conclude that the allegedly libelous statements Montway made to CentralDispatch are facts, not opinions.

### C. I dismiss Navi's claim for tortious interference with contract

In Delaware, tortious interference with contract requires: "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987).

Navi's tortious-interference-with-contract claim fails for a simple reason: Navi has failed to plausibly allege that CentralDispatch breached any contract with it. According to the countercomplaint, Navi and CentralDispatch had "[a] valid contract," and Montway's actions "induce[d] a *disruption* of th[at] contract." Countercompl. ¶¶ 60 (first quotation), 62 (second one) (emphasis added). But a disruption of a contract—even a "termination of a contract"—is "not necessarily … equivalent to breach of a contract." *Colbert v. Goodville Mut. Cas. Co.*, 2011 WL 441363, at *1 (Del. Super. Ct. Jan. 31, 2011). And the countercomplaint contains no information about what contractual provision CentralDispatch breached. What is more, the materials attached to the countercomplaint undermine any inference of breach. Under its terms of use, CentralDispatch could "suspend or terminate [Navi's] Membership and/or … access to [the load board], or any of its features … for any … reason." D.I. 33-5 at 2. The countercomplaint does not reference any other contractual provisions that could have overridden that term.

Even under Delaware's liberal pleading standards, the sparse allegations in the countercomplaint do not cut it. *See IAC Search, LLC v. Conversant LLC*, 2017 WL

18

3500244, at *1 (Del. Ch. Jan. 13, 2017) ("[W]hen asserting a claim for breach … a plaintiff at least must identify a provision of the relevant contract that allegedly was breached and provide a basic explanation why a breach occurred"). They are not enough under Rule 8's more stringent plausibility standard either. *See* Fed. R. Civ. P. 8; *Cent. Mortg. Co v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 537 (Del. 2011). I thus dismiss the tortious interference with contract count. But I do so without prejudice: Navi may amend its countercomplaint to identify a specific contractual provision that CentralDispatch allegedly breached notwithstanding the term letting it "suspend or terminate" Navi's membership for any reason.

* * * * *

Navi has stated counterclaims against Montway for tortious interference with business relations and trade libel, and *Noerr-Pennington* does not immunize Montway from liability on those claims. But Navi has failed to state a claim against Montway for tortious interference with contract, so I dismiss that claim without prejudice. Navi may amend its countercomplaint if it wishes to do so.

19